UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

```
_____
                               )
PABLO J. QUINTERO,             )
JOANNIE PRINCIPE,              )
individually and on behalf of  )
all others similarly situated, )
                               )
              Plaintiffs,      )
                               )
         v.                    )        CIVIL ACTION
                               )        NO. 20-01075-WGY
METRO SANTURCE,INC., d/b/a      )
PAVIA HOSPITAL SANTURCE        )
a corporation, METRO HATO REY, )
INC., d/b/a PAVIA HOSPITAL HATO )
REY, and DOES 1-10,            )
              Defendants.      )
_____)
```

YOUNG, D.J.[1]                                    December 9, 2021

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

In this putative class action, two patients, the plaintiffs
Pablo J. Quintero and Joannie Principe ("the Patients"),
individually and on behalf of all others similarly situated,
bring suit against two hospitals, the defendants Metro Santurce,
Inc., d/b/a Pavia Hospital Santurce, and Metro Hato Rey, Inc.,
d/b/a Pavia Hospital Hato Rey ("the Hospitals") because of a
ransomware attack that allegedly led to the exposure of their

---

[1] Of the District of Massachusetts, sitting by designation.

personally identifiable information ("PII") and protected health
information ("PHI").[2]  See generally Compl. ECF No. 1.

On October 13, 2021, this Court held oral argument on
Hospitals' motion to dismiss.  See October 13, 2021 Minute
Order, ECF No. 32.  After hearing, the Court concluded that no
injury plausibly was alleged for Constitutional standing
purposes.  The motion to dismiss for lack of standing was
ALLOWED, the remaining grounds of motion to dismiss were DENIED

---

[2] "The Cybersecurity and Infrastructure Security Agency . .
. an agency within the Department of Homeland Security . . .
defines 'ransomware' as a type of malicious software . . . that
is designed to restrict or deny access to computer data until a
ransom, typically in the form of bitcoin, is fully paid by the
victim(s)."  Helena Roland, The Survival of Critical
Infrastructure: How Do We Stop Ransomware Attacks on Hospitals?,
29 Cath. U.J.L. & Tech. 177, 180 (2020).  Similarly, the United
States Secret Service describes ransomware as "a type of
malicious software (malware), which denies access to systems or
data and/or exfiltrates data."  United States Secret Service
Cybercrime Investigation, Preparing for a Cyber Incident: a
Guide to Ransomware,
https://www.secretservice.gov/sites/default/files/reports/2020-
12/Preparing%20for%20a%20Cyber%20Incident%20-
%20A%20Guide%20to%20Ransomware%20v%201.0.pdf (last visited
September 13, 2021).  "Cyber actors hold systems or data hostage
until a ransom is paid for a decryption key.  Cyber actors also
threaten to publish exfiltrated data, or sell it on the dark
web."  Id.  Hospitals are apparently particularly vulnerable to
this type of attack.  See Roland, supra note 2, at 181-82
(discussing the history and growing problem of ransomware).  "In
2019, the United States was hit by an unprecedented number of
ransomware attacks that impacted at least 966 government
agencies, 1,233 educational establishments, and 764 health care
providers at a potential cost in excess of $7.5 billion."
Marcus Chung, New Ransomware Innovations Bring Shame and Fear to
Health Care, 22 J. Health Care Compliance 37, 38 (2020).

as MOOT and the action was dismissed without prejudice.   See id.
This memorandum explains the Court's decision.

## II.   BACKGROUND

### A. Procedural History

The Hospitals moved to dismiss the complaint ("the
Motion").  Mot. Dismiss ("Mot."), ECF No. 18.  The Patients
opposed the Motion ("the Opposition").  Pls.' Opp'n Defs.' Mot.
Dismiss ("Opp'n"), ECF No. 19.  The Hospitals filed a reply and
submitted supplemental authority.  Reply Supp. Mot. Dismiss
("Reply"), ECF No. 21-1; Mot. Leave Submit Suppl. Authority, ECF
No. 29.  The Court heard oral argument and allowed the Motion
solely on the ground of lack of standing on October 13, 2021.
See October 13, 2021 Minute Order.

### B. Facts Alleged in the Complaint

In the "Factual Allegations" section of the complaint, the
Patients allege that "[o]n February 12, 2019, . . . [the
Hospitals] . . . suffered a computer hack in which money was
demanded in exchange for the release of the computer systems."
Compl. ¶ 19.[3]  "During this hack, critical patient PII was
exposed to the hackers."  Id. ¶ 19.  "On June 18, 2019, over
four months later, [the Hospitals] began sending letters to the
breach victims to inform them of the data breaches."  Id. ¶ 20.

[3] The Court will refer to this incident as the Ransomware
Attack.

According to the Patients, the Hospitals promised to safeguard
the patient's information, but nonetheless "allowed [the]
hackers to obtain it" during the Ransomware Attack.  Id. ¶ 22.
This is the entirety of the complaint's factual allegations with
respect to the Ransomware Attack.  In the "Nature of Action"
section of the complaint, the Patients also allege "[o]n
information and belief, the security breach compromised [their]
full names, addresses, dates of birth, gender, financial
information, and social security numbers."  Id. ¶ 4.

The letters, referenced in the complaint (though not
attached, but submitted separately by the Hospitals), are
substantively identical and state:

> On February 12, 2019, we learned that your
> information was involved in an incident that impacted
> the Hospital's network . . . . We immediately took
> steps to ensure the security of your information.
> None of your information was lost as a result of the
> incident, and to date there is no evidence to suggest
> that any of your information was exfiltrated from the
> network or that there has been any attempt to misuse
> your information.
>
> The security of your information is of the
> highest importance to us, and we are handling this
> incident with the greatest of care.  Immediately after
> the incident, we began an investigation and retained
> forensic and other consultants to assist us to
> remediate the effects of the incident, including
> working with law enforcement.  All data, including
> your information, was restored on April 6, 2019
> without any corruption or exfiltration of the data.
> Moreover, the Hospital and its consultants found no
> evidence to suggest that your information was viewed,
> accessed or disclosed as a result of the incident.  We
> will continue to monitor the situation and will advise

[4]

> you if we become aware of any new developments.  We
> are also reinforcing our existing security protocols
> and providing additional training to our employees to
> reduce the likelihood of a similar event occurring in
> the future.

Mot. Tendering Ex. Mot. Dismiss, Ex. 1, June 18, 2019 Letter

Pablo Quintero ("Letter Pablo Quintero") 1, ECF No. 28-1; Id.

Ex. 2, June 18, 2019, Letter Joannie Principe ("Letter Joannie

Principe") 1, ECF No. 28-2.  Notably, the Patients allege in the

complaint that the notification was late, but not that the

contents of the letter are inaccurate.  Compl. ¶ 20.

The complaint is, however, rife with allegations that the

Patients' PII and PHI was "exposed," and the Patients and class

are in imminent risk of harm for identity theft and identity

fraud.  Compl. ¶¶ 10, 19, 51, 57, 58, 60.  There are allegations

that PII was "disclosed" and "accessed."  Id. ¶¶ 66, 115; see

also id. ¶ 114.  There are vague allegations in the "Nature of

the Action" section that the Patients and putative class members

PII was "harvested," id. ¶¶ 2, 5, and that unattributed "patient

information was stolen," id. ¶ 6.  The Patients, on information

and belief, claim that PII was "accessed by hackers."  Id. ¶ 10.

The allegations of actual theft and misuse of data are,

however, conclusory, vague, and logically disconnected from the

specific factual allegation concerning the alleged Ransomware

Attack.  For example, the Patients claim that the Hospitals

promised they would not disclose PII or PHI to "any unauthorized

third parties" but "[in fact] allowed them to obtain it."  <u>Id.</u> ¶
22.  The Plaintiff's complaint also contains a heading claiming,
"the Data Breach has Resulted and Will Result in Identity Theft
and Identity Fraud."  <u>Id.</u> 11.  That section, however, notably
contains allegations that do not support identify theft or fraud
at all.  In a later section, there is a conclusory allegation
that the Hospitals' actions and omissions caused "theft and
dissemination into the public domain of [the Patients'] . . .
PII," but this allegation is tempered by allegations of
"potential fraud and identity theft."  <u>Id.</u> ¶ 61.  While this
last allegation certainly could be read on its face that
information was sold "on the Internet black market" this
allegation is again, when read in context, pure speculation.
<u>Id.</u>

### III. ANALYSIS

The salient issue in the Hospitals' motion is whether a
pure ransomware attack -- an attack that holds data hostage but
does not steal it -- is an injury sufficient to confer
constitutional standing.  As this Court ruled at the hearing,
the complaint, when read as a whole, indicates to this Court
that, while there are sufficient allegations of a pure
ransomware attack, there are speculative and conclusory
statements, not supported by sufficiently pleaded facts, that

data was accessed, stolen, and misused.  Accordingly, the Court
ruled that the Patients have no constitutional standing.

### A.   The Motion to Dismiss Standard

"The proper vehicle for challenging a court's subject-
matter jurisdiction is Federal Rule of Civil Procedure
12(b)(1)."  Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362
(1st Cir. 2001).  As posed here, it appears that the Hospitals
are challenging the sufficiency of the allegations.  Therefore,
this Court "must credit the [Patients'] well-pleaded factual
allegations (usually taken from the complaint, but sometimes
augmented by an explanatory affidavit or other repository of
uncontested facts), draw all reasonable inferences from them in
[their] favor, and dispose of the challenge accordingly."  Id.
at 363.

The First Circuit applies "the plausibility standard
applicable under Rule 12(b)(6) to standing determinations at the
pleading stage."  Hochendoner v. Genzyme Corp., 823 F.3d 724,
730 (1st Cir. 2016).  That is, the Patients "bear[] the burden
of establishing sufficient factual matter to plausibly
demonstrate his standing to bring the action.  Neither
conclusory assertions nor unfounded speculation can supply the
necessary heft."  Id. at 731; see Katz v. Pershing, LLC, 672
F.3d 64, 70 (1st Cir. 2012) ("In considering the pre-discovery
grant of a motion to dismiss for lack of standing, we accept as

true all well-pleaded factual averments in the plaintiff's
complaint and indulge all reasonable inferences therefrom in his
favor." (citations, quotations and punctuation omitted)).  At
the bottom, this Court must determine "whether <u>all</u> the facts
alleged, when viewed in the light most favorable to the
plaintiffs, render the plaintiff's entitlement to relief
plausible."  <u>Ocasio-Hernandez</u> v. <u>Fortuno-Burset</u>, 640 F.3d 1, 14
(1st Cir. 2011) (emphasis original).  That is, the Court must
"evaluate the cumulative effect of the factual allegations."
<u>Id.</u>

        "Federal courts are courts of limited jurisdiction and . .
. . because standing is a prerequisite to a federal court's
subject matter jurisdiction, the absence of standing may be
raised at any stage of a case."  <u>Hochendoner</u>, 823 F.3d at 730.
"Each element of standing 'must be supported in the same way as
any other matter on which the plaintiff bears the burden of
proof, <u>i.e.</u>, with the manner and degree of evidence required at
the successive stages of the litigation.'"  <u>Id.</u> (emphasis in
original) (quoting <u>Lujan</u> v. <u>Defs. of Wildlife</u>, 504 U.S. 555, 561
(1992)).  "Where, as here, a case is at the pleading stage, the
plaintiff must 'clearly . . . allege facts demonstrating' each
element."  <u>Spokeo, Inc.</u> v. <u>Robins</u>, 136 S. Ct. 1540, 1547 (2016)
(quoting <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 518 (1975)).  Where no
class is yet certified, the Court "evaluate[s] only whether the

[8]

[named] plaintiff[s have] . . . constitutional . . . standing to
pursue the action."[4]  Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st
Cir. 2012) (citing Nat'l Org. for Women, Inc. v. Scheidler, 510
U.S. 249, 255 & n. 3 (1994)).

### B.   The Named Patients Lack Standing

"Article III confines the federal judicial power to the
resolution of 'Cases' and 'Controversies.'"  TransUnion LLC v.
Ramirez, 141 S. Ct. 2190, 2203 (2021).  "For there to be a case
or controversy under Article III, the plaintiff must have a
'personal stake' in the case -- in other words, standing."  Id.
(citation and quotation omitted).  To establish standing, "a
plaintiff must show (i) that he suffered an injury in fact that
is concrete, particularized, and actual or imminent; (ii) that
the injury was likely caused by the defendant; and (iii) that
the injury would likely be redressed by judicial relief."  Id.
at 2203 (citing Lujan, 504 U.S. at 560-61 (1992)); see Suárez-
Torres v. Panaderia Y Reposteria España, Inc., 988 F.3d 542, 549
(1st Cir. 2021).  Put succinctly, "[i]f the plaintiff does not
claim to have suffered an injury that the defendant caused and
the court can remedy, there is no case or controversy for the
federal court to resolve."  TransUnion, 141 S. Ct. at 2203
(citation and quotation omitted).

---

[4] The parties agree that statutory standing is not an issue
before the Court.  See Mot. 12; Opp'n 9.

A concrete injury is one that "real, and not abstract."
TransUnion, 141 S. Ct. at 2204 (quoting Spokeo, Inc. v. Robins,
578 U.S. 330, 340 (2016)).  While "[t]raditional tangible harms,
such as physical and monetary harms" are "obvious," intangible
harms while less obvious, include "reputational harms,
disclosure of private information, and intrusion upon
seclusion."  Id.

A concrete injury must be "actual or imminent, not
conjectural or hypothetical," which "ensures that the harm has
either happened or is sufficiently threatening; it is not enough
that the harm might occur at some future time."  Katz, 672 F.3d
64, 71 (1st Cir. 2012).  Indeed, "[s]tanding is not an
'ingenious academic exercise in the conceivable.  A plaintiff
must allege that he has been or will in fact be perceptibly
harmed . . . , not that he can imagine circumstances in which he
could be affected.'"  Id. at 80 (quoting United States v.
Students Challenging Regulatory Agency Procs. (SCRAP), 412 U.S.
669, 688-89 (1973)).

"An allegation of future injury may suffice if the
threatened injury is 'certainly impending,' or there is a
'substantial risk' that the harm will occur."  Susan B. Anthony
List v. Driehaus, 573 U.S. 149, 158 (2014) (emphasis added)
(quoting Clapper v. Amnesty Int'l. USA, 568 U.S. 398, 409, 414
n.5 (2013)).  It is a "disjunctive . . . test: injury is

imminent if it is certainly impending <u>or</u> if there is a
substantial risk that harm will occur." <u>Reddy</u> v. <u>Foster</u>, 845
F.3d 493, 500 (1st Cir. 2017) (emphasis in original).

The First Circuit has not yet addressed the issue of the
possibility of future misuse of data in a pure ransomware
attack.  Moreover, it "has not yet confronted the question . . .
[of] whether victims of a data breach who allege that they will
face the possibility of future identity theft because cyber-
criminals have already used the <u>stolen</u> PII have suffered an
injury in fact." <u>Portier</u> v. <u>NEO Tech. Sols.</u>, 3:17-CV-30111-TSH,
2019 WL 7946103, at *6 (D. Mass. Dec. 31, 2019) (Robertson,
M.J.) (emphasis added) <u>report and recommendation adopted</u>, No.
3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020).[5]

As Magistrate Judge Robertson correctly articulated in
<u>Portier</u> v. <u>NEO Technology Solutions</u>, there is an apparent
circuit split on this issue.  <u>Id.</u>  "The Sixth, Seventh, Ninth,
and D.C. Circuits have found that allegations of the threatened
risk of future identity theft constitute an injury in fact if
the threat is 'sufficiently imminent.'"  <u>Id.</u>

The First, "Second and Eighth Circuits have found that
plaintiffs who merely alleged an increased risk of future harm

---

[5] Notably, <u>Portier</u> was a case where there was an allegation
of actual theft and use of the data; it was not a ransomware
case.  <u>Portier</u>, 2019 WL 7946103, at *1.

did not have standing." _Id._; _see_ _Katz_, 672 F.3d at 80 (holding
in the context of a non-ransomware case, that when "the
plaintiff alleges only that there is an increased risk that
someone might access her data and that this unauthorized access
(if it occurs) will increase the risk of identity theft and
other inauspicious consequences . . . .  the risk of harm that
she envisions is unanchored to any actual incident of data
breach."  In this case, "[t]his omission [was] fatal: because
[the plaintiff did] not identify any incident in which her data
[had] ever been accessed by an unauthorized person, [and, thus
could] not satisfy Article III's requirement of actual or
impending injury").

 In between, "[t]he Third and Fourth Circuits have
'straddled the circuit split with decisions finding no injury in
fact based on an increased risk of identity theft based on one
set of facts and a cognizable injury in fact on another set of
facts.'"  _Portier_, 2019 WL 7946103, at *6; _see also_ Georgia D.
Reid, _No Standing and No Recourse: The Threat to Employee Data_
_Under Current U.S. Cybersecurity Regulation_, 36 Touro L. Rev.
1161, 1183 (2021) (describing circuit split).  Despite the
_apparent_ split, whether standing exists really depends on a
close analysis of the facts alleged.  _Portier_, 2019 WL 7946103,
at **15-17.

[12]

Due to this apparent split, Magistrate Judge Robertson
followed a non-exhaustive, three-factor analysis recently
distilled by Judge Scriven in In re 21st Century Oncology
Customer Data Security Breach Litigation, 380 F. Supp. 3d 1243,
1251 (M.D. Fla. 2019) ("[A]lthough the circuits have diverged in
result, the bases behind the differing decisions have several
commonalities."), which attempts to reconcile the perceived
split by addressing the following common factors: "(1) the
motive of the unauthorized third-party who accessed or may
access the plaintiff's sensitive information, (2) the type of
sensitive information seized, and (3) whether the information
was actually accessed and whether there have been prior
instances of misuse stemming from the same intrusion."  Id. at
1254-55.  The Hospitals, Mot. 9, as well as the Patients, Opp'n
6. (citing Portier factors), follow this rubric and this Court
observes that this analytical framework is useful.

Here, the Hospitals appear to concede the second factor --
that the information is sensitive, as it includes social
security numbers among other information.  Mot. 10 (citing In re
21st Century, 380 F. Supp. 3d at 1253).  The Court agrees that
the allegations of the complaint support this factor.

As to the first factor, the Court rules that the complaint
fails sufficiently to allege motive other than a garden-variety
ransomware attack -- targeting the holder of the information by

[13]

denying access to the information, the complaint does not allege
the hackers intended to steal and sell information.  Here, the
Hospitals correctly argue that there are no sufficiently pleaded
allegations of a motive to steal the PII for identity theft or
fraud.  Mot. 10 (citing Khan v. Children's Nat'l. Health Sys.,
188 F. Supp. 3d 524, 530 (D. Md. 2016)).  A review of the
complaint reveals only that the attack itself was a ransomware
attack –- an exchange of money for return of access to data.
Furthermore, the use of statistics in the complaint, a tactic
employed "in numerous other cases, do[es] not by [itself]
establish that there is 'certainly impending' harm under the
specific facts of a given case."  Khan, 188 F. Supp. 3d at 533.

    As to third factor, the Hospitals argue that there is no
evidence of misuse, pointing to Puerto Rico's one-year statute
of limitations as a guide.  Mot. 10-11 (citing P.R. Laws Ann.
tit. 31, §5298).  The Hospitals argue, and the Patients
confirmed at the hearing, that since the Data Breach they are
unaware of evidence of identity theft, fraud, or misuse of the
data.  Id.  Indeed, the letter sent by the Hospitals to the
Patients, states that there was no exfiltration of data.  See
Letter Pablo Quintero 1; Letter Joannie Principe 1.  That
letter, of course, is not controlling, and the Court is not
weighing evidence, but rather parsing the sufficiency of the
allegations.

[14]

The Patients respond that they have alleged an injury in fact.  Opp'n 3.  They cite cases that stand for the proposition that where PII is targeted for theft a reasonable inference can be drawn that the data will be misused.  Id. 4 (citing Galaria v. Nationwide Mut. Ins. Co., 663 F. App'x 384, 388 (6th Cir. 2016); Remijas v. Neiman Marcus Grp., LLC, 794 F.3d 688, 692-96 (7th Cir. 2015)); cf. Nathaniel Truitt, A Chance to Stand: Why "Loss-of-Chance" Should Replace the "Certainly Impending" Framework for Data Breach Cases, 46 N. Ky. L. Rev. 22, 29, 27 (2019) (arguing, as do the Patients, that relief ought be untethered from actual fraudulent activity).  These cases, of course, are not controlling in this Circuit, but in any event are distinguishable because there were, in each case, allegations of fraud or identify theft.[6]  See, e.g., Galaria, 663

<hr>

[6] At the hearing, the Court asked for the Patients' best case factually analogous to this action, and counsel pointed this Court to Remijas, 794 F.3d 688, and Krottner v. Starbucks Corp., 628 F.3d 1139 (9th Cir. 2010).  Those cases are distinguishable.  "In Krottner and Remijas, the allegations included either actual examples of the use of the fruits of the data breach for identity theft, even if involving victims other than the named plaintiffs, or a clear indication that the data breach was for the purpose of using the plaintiffs' personal data to engage in identity fraud."  Khan, 188 F. Supp. 3d at 530.  Moreover, neither were ransomware cases.
The parties each also cite to TransUnion as support for their respective positions.  TransUnion provides a recitation of the elements of standing; it is not a ransomware case.  TransUnion, 141 S. Ct. at 2203.  Rather, on the facts it is a credit reporting case deciding primarily an issue of Article III standing under federal law.  Id. at 2207.  There, certain class members had their inaccurate credit reports disseminated to

F. App'x at 386 ("[H]ackers broke into [the defendant's]
computer network and stole the personal information of
Plaintiffs . . . [The defendant] also suggested that Plaintiffs
set up a fraud alert and place a security freeze on their credit
reports."); Remijas, 794 F.3d at 692 ("Here, the complaint
alleges that everyone's personal data has already been stolen;
it alleges that the 9,200 who already have incurred fraudulent
charges have experienced harm.").

The Patients also cite to Magistrate Judge Robertson's
Portier decision and adopt the In re 21st Century analysis that
she performed.  Opp'n 5-6.  They agree with the Hospitals that

---

third parties –- standing existed because of a concrete injury.
See id. at 2209.  With respect to the remaining class members
there was no demonstration of dissemination of any incorrect
credit information.  See id. at 2212.  The Court held that in
the absence of actual dissemination, or some claim for
independent harm to the risk of their credit reports being
exposed, such as emotional distress damages, that risk of future
harm was "unavailing" for Article III purposes.  Id. at 2212
(emphasis added).  Furthermore, there was not a "sufficient
risk" of future harm where the risk was "too speculative to
support Article III standing.  Id. (emphasis added).  Indeed,
the Court found "persuasive argument that in a suit for damages,
the mere risk of future harm, standing alone, cannot qualify as
a concrete harm –- at least unless the exposure to the risk of
future harm itself causes a separate concrete harm."  Id. at
2210-11.  As TransUnion argued, "if an individual is exposed to
a risk of future harm, time will eventually reveal whether the
risk materializes in the form of actual harm."  Id. at 2211.
Applied here, TransUnion does not change the analysis.  There is
no allegation of emotional distress, and even if there was the
TransUnion Court took no position as to what would be sufficient
in that circumstance.  Id. at 2211 n. 7.  In the context of a
pure ransomware case, TransUnion does not enhance the Patients'
standing argument.

the information was sensitive -- it included social security
numbers.  Id. 6.  They further argue that:

> [t]he data was stolen by hackers who held [the
> Hospitals'] system hostage.  These were individuals
> with malevolent intent, looking to profit from their
> intrusion, and they can be expected to have sold the
> data on the dark web in addition to holding it
> hostage.  The type of information that was stolen was
> highly sensitive, including social security numbers.
> And the data was actually accessed.  It was encrypted
> by the hackers, which required them to access it.

Id.  That argument -- access by encryption equals acquisition
and misuse -- is a bridge too far, mere speculation, and is not
in accord with the modern trend in this area of the law.  See
Hartigan v. Macy's, Inc., 501 F. Supp. 3d 1, 5 (D. Mass. 2020)
(Saris, J.) (finding no substantial risk of future harm where
among other things "there [were] no allegations of any
fraudulent use or even attempted use of the personal information
to commit identify theft with respect to any Macy's customer
whose credit information was stolen."); Portier, 2019 WL
7946103, at *8 ("If identity theft has occurred, courts are more
apt to find an imminent harm. . . . On the other hand, courts
are less likely to find an injury in fact where there are no
allegations of fraudulent misuse of the stolen information.");
Khan, 188 F. Supp. 3d at 531 ("The majority of district courts
faced with challenges to the standing of data breach victims
follow this pattern.  In the absence of specific incidents of
the use of stolen data for identity fraud purposes, district

[17]

courts have generally found that the increased risk of identity theft does not confer standing."); In re Zappos.com, Inc., 108 F. Supp. 3d 949, 955 (D.Nev. 2015) (listing cases).

As a final argument, the Patients claim they have lost the benefit of their bargain with the Hospitals to not have their confidential information exposed, Opp'n 7 (citing Carlsen v. GameStop, Inc., 833 F.3d 903, 909 (8th Cir. 2016)), a point left open in this Circuit by Katz, see Katz, 672 F.3d at 77 ("The plaintiff's remonstrances about the benefit of the bargain do not change this calculus. She has no bargain with the defendant and, therefore, no entitlement to any benefit from the defendant."); see also Hartigan, 501 F. Supp. 3d at 6 ("The breach of a contractual right can constitute an injury sufficient to create standing.") (citing Katz, 672 F.3d at 72)). This argument is insufficient here.

In Carlsen v. Gamstop, Inc., the plaintiff had a video game subscription with the defendants. 833 F.3d at 907. The Eighth Circuit cautioned not to conflate standing and a potential cause of action. Id. at 909. That court found an actual injury:

> Here, Carlsen has provided sufficient facts alleging
> that he is party to a binding contract -- the terms of
> service, which include the Game Informer privacy
> policy -- with GameStop, and GameStop does not dispute
> this contractual relationship. Carlsen also has
> alleged that GameStop has violated that policy by
> "systematically disclos[ing] Game Informer's users'
> PII . . . to third party Facebook and/or allow[ing]
> Facebook to directly collect that information itself."

[18]

This allegation of breach is both concrete and
particularized, as the breach allegedly already has
occurred, and any consequences of the breach have
occurred specifically to Carlsen as a result of the
actions of GameStop's alleged systematic disclosure
via the Facebook SDK.  Additionally, Carlsen alleged
that he has suffered damages as a result of GameStop's
breach in the form of devaluation of his Game Informer
subscription in an amount equal to the difference
between the value of the subscription that he paid for
and the value of the subscription that he received,
i.e., a subscription with compromised privacy
protection.  Accordingly, Carlsen has alleged an
"actual" injury.  See id. at 961; cf. Ben Oehrleins &
Sons & Daughter, Inc. v. Hennepin Cty., 115 F.3d 1372,
1379–80 (8th Cir. 1997) (finding even indirect
economic injury constitutes an injury in fact where
the injury was concrete, particularized, actual, and
in no way hypothetical or conjectural).

Id. at 909.  The Patients analogize that the devaluation of

a video game company's subscription, which included privacy

protection, is the same as privacy obligations that are

purportedly concomitant with the provision of medical

services.  Opp'n 7.

    In reply, the Hospitals do not attack the benefit of the

bargain theory directly, but argue persuasively that the

Patients assume that the "PII was accessed and [is] currently in

the possession of unknown third parties."  Reply 1.  Simply put,

as argued by the Hospitals, "[w]here, as here, the third party

did not exfiltrate PII, there is no harm."  Id. 2.

    The Court rules that, on balance, to the extent that this

was a pure ransomware attack, the bald allegations of the

complaint read in their entirety are insufficient to convert

[19]

this into a data theft case.  See, e.g., Graham v. Universal
Health Serv., Inc., CV 20-5375, 2021 WL 1962865, at *4 (E.D. Pa.
May 17, 2021) ("The target of a ransomware attack is the holder
of the confidential data; the misappropriation of the data,
whether by theft or merely limitation on access to it, is
generally the means to an end: extorting payment.  A court is
still left to speculate, as in Reilly, whether the hackers
acquired Plaintiffs' PHI in a form that would allow them to make
unauthorized transactions in their names, as well as whether
Plaintiffs are also intended targets of the hackers' future
criminal acts.  At this juncture, the most Plaintiffs can plead
is that the hackers secured their PHI through a ransomware
attack against Universal.").  Here, on the current state of the
law, the inclusion of a benefit of the bargain claim does not
confer standing on this complaint.  See Clemens v. ExecuPharm,
Inc., CV 20-3383, 2021 WL 735728, at *5 (E.D. Pa. Feb. 25, 2021)
(dismissing claim for lack of standing, even though an alternate
basis of contractual standing was proposed, where the Third
Circuit had not ruled on issue and "the presence of contractual
claims [had] not been relevant to courts' analyses of standing
in data breach cases in [the] Circuit");  Browne v. US
Fertility, LLC, CV 21-367, 2021 WL 2550643, at *3 (E.D. Pa. June

22, 2021);[7] see also Blahous v. Sarrell Reg'l. Dental Ctr. for Pub. Health, Inc., 2:19-CV-798-RAH-SMD, 2020 WL 4016246, at *6 (M.D. Ala. July 16, 2020); Abernathy v. Brandywine Urology Consultants, P.A., C.A. No. N20C-05-057-MMJCCLD, 2021 WL 211144, at *5 (Del. Super. Ct. Jan. 21, 2021).

**IV.  CONCLUSION**

The named Patients in this action have alleged a pure ransomware attack against the Hospitals: a third-party holding the Patients information hostage in exchange for money from the Hospitals.  Absent plausible allegations that the information itself was accessed and misused the named Patients lack constitutional standing to sue the Hospitals because the injury is not actual or imminent, but rather is merely conjectural or hypothetical.  The hearing confirms that the Patients have not suffered identity theft or fraud.  Reading the well-pleaded allegations of the complaint in whole, and taking all inferences in favor of the Patients, what is alleged plausibly to have happened is a pure ransomware attack, with conjectural and

---

[7] While these cases arise in the Third Circuit, which requires actual misuse, see Reilly v. Ceridian Corp., 664 F.3d 38, 42 (3d Cir. 2011), the Court is persuaded by their reasoning that pure ransomware cases are fundamentally different from data theft cases for purposes of standing, even under alternative theories such as breach of contract.  Moreover, the Patients have not pointed this Court to any case where a patient has been able to assert standing under a loss of benefit of the bargain theory absent misuse of the information.

speculative allegations of a theft and a fraud that have not yet
materialized.

Accordingly, for the aforementioned reasons, the Hospitals'
motion to dismiss for lack of standing pursuant to Fed. R. Civ.
P. 12(b)(1) (ECF No. 18) was <u>ALLOWED</u>, as to the remaining
grounds it was <u>DENIED</u> as <u>MOOT</u>, and the action was <u>DISMISSED</u>
without prejudice.[8]

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[9]

---

[8]  The Court only decides the standing issue because when a
"court is confronted with motions to dismiss under both Rules
12(b)(1) and 12(b)(6), it ordinarily ought to decide the former
before broaching the latter." <u>Deniz</u> v. <u>Mun. of Guaynabo</u>, 285
F.3d 142, 149 (1st Cir. 2002).  Indeed, "deciding a Rule
12(b)(6) motion after finding no subject-matter jurisdiction is
gratuitous." <u>United States</u> v. <u>Millenium Laboratories, Inc.</u>, 923
F.3d 240, 251 n. 13 (1st Cir. 2019), <u>cert. denied sub nom.</u>,
<u>Estate of Cunningham</u> v. <u>McGuire</u>, 140 S. Ct. 851 (2020).

[9] This is how my predecessor, Peleg Sprague (D. Mass 1841-
1865), would sign official documents.  Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 43 years.